**No. 24-1198**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

REUBEN KING

*Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA

*Defendant-Appellee.*

On Appeal from the United States District Court
For The Middle District of Pennsylvania
No. 5:22-cr-00215-001
Judge Joseph F. Leeson, Jr., United States District Judge

---

## CORRECTED BRIEF OF APPELLANT REUBEN KING

---

Robert E. Barnes, SBN: 235919
BARNES LAW
700 South Flower Street, Suite 1000
Los Angeles, California 90017
Telephone: (310) 510-6211
Email: robertbarnes@barneslawllp.com

*Attorneys for Appellant Reuben King*

# **TABLE OF CONTENTS**

INTRODUCTION……………………………..……………………………… 1

STATEMENT OF JURISDICTION……………………………..……………… 3

STATEMENT OF ISSUES………………………………………………… 4

STANDARD OF REVIEW…………………………………………………… 4

STATEMENT OF THE CASE………………………………………..…..……… 5

SUMMARY OF ARGUMENT……………..………………………………... 6

ARGUMENT………………………………………………………… 7

I.     Farmers Offering to Sell Guns to Neighbors Cannot be a Constitutionally Cognizable Crime Under the Second Amendment ………………………… 7

    A.  Federal Firearms Licensing Laws………………………………… 8

    B.  Second Amendment Application………………………………… 18

    C.  Fifth Amendment Application: The Rule of Lenity……………… 24

    D.  First Amendment Application…………………………………….. 26

II.    The Forfeiture of Mr. King's Collection of Personal Firearms Violated the Constitution As Applies to Mr. King…………………………………… 27

    A.  Constitutional Constraint on Criminal Forfeiture………………… 28

    B.  This Order of Forfeiture Constitutes an Excessive Fine …………. 29

CONCLUSION ……………………………………………………... 32

CERTIFICATION ………………………………………………… 33

# TABLE OF AUTHORITIES

**Constitution:**

U.S. Const. Amend. II……………….. 1, 4, 7, 8, 15, 16, 18, 19, 20, 21, 24, 27, 28

U.S. Const. Amend. V…………………………………………... 1, 2, 4, 24, 28

U.S. Const. Amend. VIII……………………………………... 2, 4, 28, 29, 30, 32

**Cases:**

*Alexis v. State,*
        437 Md. 457 (2014)..………………………………………………... 25

*Austin v. United States,*
        509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993)………………… 29

*Connally v. Gen. Const. Co.,*
        269 U.S. 385 (1926)………………………………………………... 25

*D.C. v. Heller,*
        554 U.S. 570 (2008)............................................................ 19, 20, 21, 24

*Ezell v. City of Chicago,*
        651 F.3d 684 (7th Cir. 2011)……………………………………….. 19, 20

*Heller v. District of Columbia,*
        670 F.3d 1244 (D.C. Cir. 2011)……………………………………….. 21

*Illinois Ass'n of Firearms Retailers*,
        961 F. Supp. 2d 928 (N.D. Ill. 2014)……………………………………. 20

*Lewis v. United States,*
        445 U.S. 55 (1980)…………………………………………………… 25

*Liparota v. United States,*
    471 U.S. 419 (1985)…………………………………………………... 24

*Luis v. United States,*
    578 U.S. 5 (2016)…………………………………………………... 19

*Malloy v. Hogan,*
    378 U.S. 1 (1964)…………………………………………………... 22

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010)………………………………………….. 21, 22, 28

*New York State Rifle and Pistol Association v. Bruen,*
    142 S.Ct. 2111 (2022)………………………………………….. 7, 18

*Ramos v. Louisiana,*
    140 S.Ct. 1390 (2020)……………………………………………… 22

*Sprint Communications Co. v. APCC Servs., Inc.,*
    554 U.S. 269 (2008)………………………………………………... 21

*STATE OF TEXAS, et al., Plaintiffs, v. BUREAU OF ALCOHOL, TOBACCO,*
*FIREARMS, AND EXPLOSIVES, et al., Defendants. Additional Party Names: Gun*
*Owners Found., Gun Owners of Am., Inc., Jeffrey Tormey, Louisiana, Mississippi,*
*Tennessee Firearms Ass'n, Texas, Utah, Virginia Citizens Def. League,*
    No. 2:24-CV-089-Z, 2024 WL 2967340 (N.D. Tex. June 11, 2024)... 14, 15

*Timbs v. Indiana,*
    139 S.Ct. 682 (2019)……………………………………………… 22, 28

*United States v. Bajakajian,*
    524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998)……… 4, 29, 30, 31

*United States v. Cheeseman,*

600 F.3d 270 (3d Cir. 2010)……………………………………... 4, 29

*United States v. Gradwell,*
    243 U.S. 476 (1917)……………………………………………... 25

*United States v. Hudson,*
    7 Cranch 32, 3 L.Ed. 259 (1812)……………………………………... 24

*United States v. Marzzarella,*
    614 F.3d 85 (3d Cir. 2010)…………………………………………… 19

*United States v. Pelullo,*
    178 F.3d 196 (3d Cir.1999)………………………………………… 4

*United States v. Premises Known as RR No. 1 Box 224, Dalton, Scott Twp. &
North Abington Twp., Lackawanna, Pa.,*
    14 F.3d 864 (3d Cir.1994)………………………………………… 29

*United States v. Universal C. I. T. Credit Corp.*,
    344 U.S. 218 (1952)……………………………………………….. 25

*U.S. v. Hosford,*
    843 F.3d 161 (4th Cir. 2016)..................................................... 22

*Yates v. United States*,
    135 S.Ct. 1074 (2015)……………………………………………... 25

## Statutes and Rules:

18 U.S.C. § 921……………………………………… 9, 10, 11, 13, 15, 16, 17, 18

18 U.S.C § 922…………………………………………………. 24, 26, 31

18 U.S.C § 923………………………………………………. 11, 12, 19, 23, 24, 26

18 U.S.C § 924………………………………………… 1, 2, 3, 5, 12, 13, 19, 26, 31

18 U.S.C. § 926………………………………………………… 12

18 U.S.C. § 3231……………………………………………… 3

18 U.S.C. § 3571…………………………………………….. 13

28 C.F.R. § 0.130…………………………………………… 12

28 U.S.C. § 599A…………………………………………… 12

28 U.S.C. § 1131…………………………………………… 3

28 U.S.C. § 1291…………………………………………… 3

28 U.S.C. § 1361…………………………………………… 3

28 U.S.C. § 2461(c)…………………………………….. 2, 5, 30

Fed. R. App. P. 34(a)……………………………………… 32

## **INTRODUCTION**

Reuben King, a 46-year-old Amish farmer with an eighth-grade education from Lancaster, Pennsylvania, prioritizes his life around his ten children with his wife of many years and serving the Amish community he grew up in. Mr. King spent a lifetime hobby building a gun collection, where he bought, sold, and exchanged guns with neighbors and others. He never owned a gun store, and his full-time job was being a farmer. He never obtained a federal firearms license, nor could he since a photo identification was required and the Amish religious beliefs prohibit such photo identification.  In one of the rarest prosecutions ever brought, a grand jury sitting in the Eastern District of Pennsylvania returned a one-count Indictment charging him with dealing in firearms without a license, in violation of 18 U.S.C. §§922(a)(1)(A) and 924(a)(1)(D). Trial began in this matter on May 16, 2023, and the jury returned a guilty verdict on the single count charged, forfeiting King's entire gun collection. Appx171; Doc. 48.

This novel application of the statute mirrored an attempt by the government to criminalize private gun sales and, as applied against Mr. King, violated the First, Second, and Fifth Amendments to the United States Constitution. King preserved the issue in multiple motions to dismiss, challenges to the jury instructions, and challenges to the forfeiture order. This appeal follows.

The government seized King's entire lifetime collection of over 600 guns and ordered the forfeiture of his interest in this collection as part of his sentencing, pursuant to 28 U.S.C. §2461(c) and 18 U.S.C. §924(d). Appx134-153, 172; Doc. 52. This, too, is a rarity: using the unlicensed sale of a few guns to seize and forfeit an entire collection of lawfully possessed and lawfully used guns. This punishment, in the form of the loss of an incredible amount of personally owned and collected property, constitutes an excessive fine in violation of the Eighth Amendment.

Lastly, the vagueness and ever-shifting definition of who must obtain a federal firearms license before selling a gun makes criminal punishment for not understanding the law Constitutionally offensive under the Fifth Amendment and its required rule of lenity. In the same vein, requiring a photo identification to obtain a federal firearms license violates the First Amendment when applied to an Amish farmer whose religious faith requires no photo identification.

This case presents novel issues of law of great Constitutional consequence. This case has expanded the definition of a "gun business" so broadly that any private sales have now been outlawed and can result in criminal prosecution. Ordinary people engage in these activities every day, not knowing they could lose their liberty and their property in minutes whenever the government so chooses. The Constitution compels reversal.

## STATEMENT OF JURISDICTION

This is an appeal of the judgment from the District Court for the Eastern District of Pennsylvania. This Court enjoys subject matter jurisdiction under both 18 U.S.C. §3231 and 28 U.S.C. §1291. The basis for subject-matter jurisdiction by the lower court below, the U.S. District Court for the Middle District of Pennsylvania (the "District Court"), was 28 United States Code ("U.S.C.") Sections 1131 and 1361. The underlying action arises out of the charges brought by the United States of America under 18 U.S.C. §§922(a)(1)(A) and 924(a)(1)(D). This Court of Appeals enjoys jurisdiction to hear this appeal under 28 U.S.C. §§ 1291 and 1294, as it is an appeal of a final order or judgment that disposes of all parties' claims, pursuant to the District Court's orders denying Appellant's motions to dismiss, Appx124, 322, the jury's final verdict, Appx171, and the District Court's order of forfeiture, Appx134, and the judgment after sentencing.

This appeal is timely because Appellant filed a Notice of Appeal with the District Court on February 1, 2024, less than 60 (sixty) days after judgment and entry of the Order of Forfeiture, in compliance with the Federal Rules of Appellate Procedure, Rules 3 and 4. Appx332; Doc. 25.

## STATEMENT OF ISSUES

1. Does the First, Second, and Fifth Amendments permit criminally prosecuting a farmer for selling a gun to a neighbor without a federal firearms license

when no such history and tradition exists under the Second Amendment, and especially when that farmer's Amish faith prohibits him from obtaining a license requiring photo identification and the ever-shifting definition of who must obtain a federal firearms license even confuses the government?

2. Does the Second Amendment, Fifth Amendment, and Eighth Amendment permit complete forfeiture of a lifetime gun collection based on a single charge of offering to sell a few guns without a federal firearms license, as applied to Mr. King?

## STANDARD OF REVIEW

"[A] defendant may appeal a forfeiture order once sentenced." *United States v. Cheeseman*, 600 F.3d 270, 275 (3d Cir. 2010); *United States v. Pelullo,* 178 F.3d 196, 202 (3d Cir.1999) (noting that "the order of forfeiture entered at sentencing is a final order with respect to the defendant from which he can appeal"). The Third Circuit standard reviews *de novo* a district court's determination of whether a forfeiture constitutes an excessive fine in violation of the Constitution's Eighth Amendment. *See United States v. Bajakajian,* 524 U.S. 321, 336–37, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998).

## STATEMENT OF THE CASE

Appellant asks this Court to vacate and reverse the conviction and the forfeiture.

In June 2022, a grand jury sitting in the Eastern District of Pennsylvania returned a one-count Indictment charging Mr. King with dealing in firearms without a license in violation of 18 U.S.C. §§922(a)(1)(A) and 924(a)(1)(D). Appx17; Doc. 1. A Notice of Forfeiture of firearms and ammunition, pursuant to 28 U.S.C. §2461(c) and 18 U.S.C. §924(d), accompanied the Indictment. Appx18-46; Doc. 1. The notice ordered that "defendant Reuben King shall forfeit to the United States of America all firearms and ammunition involved in the commission of such violation." *Id.*

Mr. King brought his first motion to dismiss the indictment on the basis that the charge violated his Constitutional rights–on several grounds. The District Court denied Mr. King's motion. A three-day jury trial began in this matter on May 16, 2023.  The jury reached its verdict on May 18, 2023, finding Mr. King guilty of count one of the indictment, charging dealing in firearms without a license. Appx171; Doc. 51. Additionally, the jury returned a Special Verdict, deciding that Mr. King must forfeit all but three items (3 firearms) listed on the Special Verdict Form. Appx172; Doc. 53. As a result, Mr. King was forced to turn over 600 personally owned firearms. *Id*.

On June 7, 2023, Mr. King, through his counsel, filed a second motion to set aside the verdict and forfeiture, or alternatively, a renewed motion to dismiss the

indictment. Appx186; Doc. 55. The District Court ultimately denied this motion as well. Appx322; Doc 63.

On January 23, 2024, sentencing was held. Mr. King was sentenced to 36 months of probation as to Count 1 of the Indictment. Attached to the Judgment under the "Schedule of Payments" Section, Mr. King was ordered to "forfeit [his] interest" to the United States on the 609 firearms at issue in this case. Appx154; Doc. 80. Subsequently, several *pro se* petitions were filed requesting the return of property (firearms) subject to the forfeiture. Doc. Nos. 83, 85, 86, 88, 91.

Mr. King filed his Notice of Appeal on February 1, 2024. Appx332; Doc. 81. This appeal has followed.

## SUMMARY OF ARGUMENT

This case is about the Constitutional limits on the power of the government to criminally prosecute as federal felonies the mere act of an Amish farmer offering to sell a gun to a neighbor and the complete criminal forfeiture of a lifetime gun collection for that mere act of a private offer to sell a few guns.

## ARGUMENT

**I.    Farmers Offering To Sell Guns To Neighbors Cannot Be A Constitutionally Cognizable Crime Under The Second Amendment.**

The Second Amendment protects the right to privately buy and sell a gun without conditioning and constricting that right upon advance permission of the federal government through a specially procured license from the federal government. This is especially so as applied here to an Amish full-time farmer offering to sell a gun to his neighbor who cannot even procure a federal firearms license due to its unique photo identification requirement violating his Amish religious beliefs, which the federal government provided no accommodation for.

As the Supreme Court clarified in *Bruen*, the government must show a tradition and history of gun rights restrictions at the time of our founding to justify Second Amendment-compliant federal firearms restrictions, especially criminal punishment. *New York State Rifle and Pistol Association v. Bruen*, 142 S.Ct. 2111, 2126 (2022); *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc). There is no such history for the entire first century of American independence as applied here. Anyone could buy and sell a gun with anyone without a requirement of a firearms license. No federal law restricting gun purchases or gun sales existed until the last century, and, even then, private gun sales by a farmer to a neighbor did not require a federal license that could result in criminal punishment and mass forfeiture until very recently. Hence, this conviction violated the Second Amendment.

## A. Federal Firearms Licensing Laws

As this court previously detailed, no federal laws punishing gun sales existed prior to 1938. *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc). The restrictions as applied to King didn't exist until the novel interpretation of the law just recently applied by the ATF. As such, there is no federal legislative history and tradition of such Second Amendment restrictions prior to 1938, and as such, cannot constitute a Constitutionally cognizant history to abridge the Second Amendment.

 The Gun Control Act of 1968, in its amended form, is the current source of licensing requirements for gun sales. 18 U.S.C. § 922(a)(1)(A) states that "[i]t shall be unlawful for any person except a licensed importer, licensed manufacturer, or licensed dealer to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce." At the time the conduct is alleged to have occurred in this matter, the term "engaged in the business" was defined

> [A]s applied to a dealer in firearms... a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.

18 U.S.C. § 921(a)(21)(C) (2019).

The term "with the principal objective of livelihood and profit" was defined in pertinent part to mean

that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided,* that proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism.

18 U.S.C. § 921(a)(22) (2019).

In this case, the Government alleged that Mr. King "willfully engaged in this business of dealing in firearms without being licensed to do so under the provisions of Chapter 44, Title 18, United States Code." Indictment, Appx17; Doc.1. At the time the conduct is alleged to have occurred, from on or about October 24, 2019, through on or about January 12, 2022, 18 U.S.C. § 921(a)(21)(C) defined the term "engaged in the business," in relevant part,

> [A]s applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business *with the principal objective of livelihood and profit* through the repetitive purchase and resale of firearms, *but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.* (emphasis added).

In 2016, recognizing the ambiguity within this definition, the Bureau of Alcohol, Tobacco, Firearms, and Explosives even published a guidance document stating, "Federal law does not establish a 'bright-line' rule for when a federal

firearms license is required. As a result, there is no specific threshold number or frequency of sales, quantity of firearms, or amount of profit or time invested that triggers the licensure requirement." [6]

Thereafter, Congress became aware of ATF's concern over the ambiguity and, on June 24, 2022, after the time the conduct was alleged to have occurred in this matter, amended the Gun Control Act by the passage of the Bipartisan Safer Communities Act. Pursuant to the amendments, Congress changed the definitions of "engaged in the business" and "within the principal objective of livelihood and profit" and added and defined the new term "to predominantly earn a profit." Now, engaged in the business means,

> [A]s applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.

18 U.S.C. § 921(a)(21)(C). The definition of "with the principal objective of livelihood and profit" is amended to read, in relevant part,

> [T]hat the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided,* That proof of profit shall not be required as to a person who engages

in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism.

18 U.S.C. § 921(a)(23). Finally, the term "to predominantly earn a profit" was added and defined to mean,

> [T]hat the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism.

18 U.S.C. § 921(a)(22). [7]

> Section 923, Licensing, which is unchanged, specifies in pertinent part:

> No person shall *engage in the business* of importing, manufacturing, or dealing in firearms, or importing or manufacturing ammunition, until he has filed an application with and received a license to do so from the Attorney General. The application shall be in such form and contain only that information necessary to determine eligibility for licensing as the Attorney General shall by regulation prescribe and *shall include a photograph* and fingerprints of the applicant...

18 U.S.C. § 923(a)(emphasis added). Finally, section 924(a)(1)(D) contains the penalty for violation and states that whoever "willfully violates any other provision of this chapter, shall be fined under this title, imprisoned not more than five years, or both."

The United States Attorney General has the authority to enforce the Gun Control Act of 1968 ("GCA") and promulgate regulations necessary to enforce its provisions. 18 U.S.C. § 926(a). Congress and the Attorney General, in turn, delegated GCA administrative and enforcement responsibilities to the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). 28 U.S.C. §§ 599A(b)(1), (c)(1); 28 C.F.R. §§ 0.130(a)(1)–(2).

The GCA imposes strict requirements on firearms dealers and severe consequences for violating them. It makes it unlawful for any person — save a licensed dealer — to "engage in the business" of dealing in firearms until he has filed an application with ATF and received a license. 18 U.S.C. § 923(a). It requires dealers to conduct background checks on prospective firearms recipients and to maintain records for tracing purposes. *Id.* §§ 922(t), 922(b)(5), 923(g)(1)(A). And it provides that persons who willfully engage in the business of dealing firearms without a license face imprisonment for up to five years, a fine of up to $250,000, or both. *Id.* §§ 922(a)(1)(A), 924(a)(1)(D), 3571(b)(3). Any firearms involved in such violations may be subject to administrative or civil forfeiture. *Id.* § 924(d)(1).

The Firearms Owners' Protection Act of 1986 ("FOPA") modified the GCA, adding a statutory definition of "engaged in the business" as "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or

business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." Pub. L. 99-308, § 101, 100 Stat. 449, 450 (1986). Then in 2022, President Biden signed into law the Bipartisan Safer Communities Act ("BSCA"). The BSCA broadened the definition of "engaged in the business" by eliminating the requirement that a person's "principal objective" of purchasing and reselling firearms must include both "livelihood and profit," replacing it with a requirement to "predominantly earn a profit." 18 U.S.C. § 921(a)(21)(C). However, the BSCA did not alter FOPA's exclusions for "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." *Id.*

On April 19, 2024, ATF promulgated a Final Rule to "provide clarity to persons who remain unsure of whether they are *engaged in the business* as a dealer in firearms with the *predominant intent* of obtaining pecuniary gain." 89 Fed. Reg. at 28968 (emphasis added). To that end, it clarifies "that firearms dealing may occur wherever, or through whatever medium, qualifying . . . activities are conducted." *Id.* This includes "a gun show or event, flea market, auction house, or gun range or club; at one's home; by mail order; over the internet; [and] through . . . other electronic means (*e.g.*, an online broker, online auction, text messaging service, social media

raffle, or website) . . . ." *Id.* at 28973–74. And it clarifies that "a single firearm transaction or *offer* to engage in a transaction" may require a license. *Id.* at 29091 (emphasis added).

In a case brought in the Northern District of Texas, *State of Texas et al., v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, et al.,* four States, a handful of organizations, and an individual citizen brought suit arguing that the Final Rule violates the Administrative Procedure Act ("APA") and the Constitution. No. 2:24-CV-089-Z, 2024 WL 2967340 (N.D. Tex. June 11, 2024). The multistate coalition brought suit against the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") of the U.S. Department of Justice for unlawfully attempting to abridge Americans' constitutional right to privately buy and sell firearms, arguing that the ATF's regulatory restrictions go beyond the authority granted to the agency by Congress. In their view, the Final Rule, which was intended to clarify existing law, is (1) arbitrary and capricious; (2) in excess of ATF's lawful authority; (3) an abuse of ATF's discretion; (4) in contravention of the BSCA; and (5) violative of the Second and Fourth Amendments. The district court found that the Final Rule clashes with the text of the BSCA. First, it asserts that there is no "minimum number of firearms to actually be sold to be 'engaged in the business'" for the purposes of the

licensing requirement. 89 Fed. Reg. at 29021. "[A] single firearm transaction" — or

even a mere *offer* to engage in a transaction — may suffice. *Id.* at 28976. Further,

> [W]hile selling large numbers of firearms or engaging or offering to engage
> in frequent transactions may be highly indicative of business activity, neither
> the courts nor the Department have recognized a set minimum number of
> firearms purchased or resold that triggers the licensing requirement. Similarly,
> there is no minimum number of transactions that determines whether a person
> is "engaged in the business" of dealing in firearms. *Even a single firearm*
> *transaction*, or offer to engage in a transaction, when combined with other
> evidence, *may be sufficient to require a license.*

89 Fed. Reg. at 28976 (emphasis added).

But the BSCA says otherwise:

The term "engaged in the business" means:

> . . . as applied to a dealer in firearms, as defined in section
> 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in
> firearms as a regular course of trade or business to predominantly earn a profit
> through *the repetitive purchase and resale of firearms*, but such term shall not
> include a person who makes occasional sales, exchanges, or purchases of
> firearms for the enhancement of a personal collection or for a hobby, or who
> sells all or part of his personal collection of firearms[.]

18 U.S.C. § 921(a)(21)(C) (emphasis added).

The Northern District of Texas found that Defendants' proffered

interpretation is severely undercut by Section 921(a)(21)(C)'s use of (1) "firearms,"

in the plural; (2) the phrase "regular course," clearly contemplating a series of

events; (3) "repetitive," meaning more than once; and (4) the Section's exemption

of "sales, exchanges, or purchases" in the plural. 18 U.S.C. § 921(a)(21)(C). So, too, does Section 921(a)(21)(C) require the "purchase *and* resale" of firearms — a conjunctive requirement that flatly contradicts Defendants' assertion that "there is no minimum threshold number of firearms purchased *or* sold that triggers the licensing requirement." 89 Fed. Reg. at 29091 (emphasis added).

Furthermore, the district court clarified and bolstered additional protections on the Second Amendment for personal collections of firearms in its finding that the Final Rule arbitrarily eviscerates Section 921(a)(21)(C)'s safe harbor provision. That provision reads:

> The term "engaged in the business" . . . shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms[.]

18 U.S.C. § 921(a)(21)(C). Nothing in the foregoing text suggests that the term "personal collection" does not include firearms accumulated primarily for personal protection—yet that is exactly what the Final Rule asserts. *See* 89 Fed. Reg. at 29090 ("[T]he term [personal collection] shall not include firearms accumulated . . . for personal protection[.]"). Nor can Defendants' position be supported by its *own* interpretative policy of implementing terms' "common meaning." *See id.* at 28974 ("This definition is consistent with the common meaning of 'purchase,' . . . . This definition is consistent with the common meaning of 'sale[.]'"). Here, Plaintiffs'

reading of the Section 921(a)(21)(C) terminology "personal collection" is more consonant with "common meaning." *See Collection*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993) ("[A] number of objects or persons or a quantity of a substance that has been collected or has collected often according to some unifying principle . . . ."); *see also Collection*, WEBSTER'S SECOND NEW INTERNATIONAL DICTIONARY (1940) ("That which is collected; as: a gathering or assemblage of objects or of persons; an accumulation of specimens of a certain class . . . .").

The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) published several guidance documents over the years attempting to clarify this ambiguous standard but has never identified a bright-line rule and, instead, has merely recognized and amplified the ambiguity.[12] Aware of the vagueness problem, the U.S. Congress amended the definition of engaged in the business through the Bipartisan Safer Communities Act in 2022, which now states,

> [A]s applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to *predominantly earn a profit* through the repetitive purchase and resale of firearms, *but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms*.

18 U.S.C. § 921(a)(21)(C)(emphasis added). Congress further defined "to predominantly earn a profit."

> [M]eans that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism...

18 U.S.C. §921(a)(22) (excluding definitions of terrorism).

## B. Second Amendment Application

The United States Supreme Court recently had occasion to review protection offered by the Second Amendment to the Constitution and held that

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promoted an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with the Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*New York State Rifle and Pistol Association v. Bruen*, 142 S.Ct. 2111, 2126 (2022).

The first step of the *Bruen* test outlined above is determining whether the plain text of the Second Amendment protects the conduct at issue. *Id*. An inescapable precondition of keeping and bearing arms is purchasing those arms, making the implicit right to buy and sell firearms a necessary complement protected by the plain text of the Second Amendment. *See Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir.

2011)("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."); *see also*, *Luis v. United States*, 578 U.S. 5, 26 (2016)(Thomas, J., concurring, "[c]onstitutional rights thus implicitly protect those closely related acts necessary to their exercise."). It can hardly be argued that the dealing or purchase and sale of firearms falls outside the ambit of the Second Amendment, and it is well recognized that the commercial sale of firearms is an activity protected by the Second Amendment. *See District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008); *see also United States v. Marzzarella*, 614 F.3d 85, 92 fn. 8, (3d Cir. 2010) (holding that under *Heller*, a law or regulation would be unconstitutional if it barred the commercial purchase or sale of firearms, as it would foreclose the right to keep and bear arms).

First, 18 U.S.C. § 923(a) and the violations thereof at §§ 922(a)(1)(A) and 924(a)(1)(D) are facially unconstitutional. As the commercial purchase and sale of firearms is conduct protected by the Second Amendment, we proceed to the second step of the *Bruen* test, requiring the government to justify the regulation. To succeed, the government"must demonstrate that the regulation is consistent with this Nation's historical *tradition* of firearm regulation," and while it does not need to be a

"historical twin," the tradition of a state,[1] around the time of Founding, must, at a minimum, be a historical analogue. *Bruen*, 142 S.Ct. at 2126, 2133 (2022)(emphasis added). But a single historical analogue around the time of the Founding of a state is not a tradition; rather, it is a mere aberration or anomaly with no followers.[2] Even two or three historical analogues of the states around the time of Founding are, at best, a trend and not a tradition,[3] especially when short-lived.[4]

In addressing what constitutes the Nation's historical tradition of firearm regulation, *Bruen* explains that "when it comes to interpreting the Constitution, not all history is created equal." *Id*. at 2136. That is why courts "must . . . guard against giving post enactment history more weight than it can rightly bear." *Id.* "As [the Court] recognized in *Heller* itself, because post-Civil War discussions of the right to

---

[1] *See,* Bruen, 142 S. Ct. at 2154-55 (finding the statutes of territories deserving of "little weight" because they were "localized," and "rarely subject to judicial scrutiny").

[2] *See, D.C. v. Heller*, 554 U.S. 570, 632 (2008) ("[W]e would not stake our interpretation of the SecondAmendment upon a single law ... that contradicts the overwhelming weight of other evidence.")

[3] *See, Ezell*, 651 F.3d at 706 (finding that two historical statutes "falls far short of establishing that [a regulated activity] is wholly outside the Second Amendment as it was understood" in 1791); *Illinois Ass'n of Firearms Retailers*, 961 F. Supp. 2d 928, 937 (N.D. Ill. 2014) ("[C]itation to a few isolated statutes—even to those from the appropriate time period—fall[s] far short of establishing that gun sales and transfers were historically unprotected by the Second Amendment") (internal quotation marks omitted).

[4] *See, Bruen*, 142 S. Ct. at 2155 ("[T]hese territorial restrictions deserve little weight because they were . . . short lived.")

keep and bear arms came '75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Id.* at2137 (quoting *Heller*, 554 U.S. at 614); *see also Sprint Communications Co. v. APCC Servs., Inc.,* 554 U.S. 269, 312 (2008) (Roberts, C.J., dissenting) ("The belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of [the Constitution in 1787]"). In fact, "post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, 142 S. Ct. at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274, n. 6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). *Bruen* thus establishes that this Court must prioritize Founding Era evidence, while evidence from around the "mid- to late 19th century" is, at most, "secondary." *Id.*[5] at 2137. "19th-century evidence [is] treated as mere confirmation of what the Court thought had *already been established*" in the Founding era. *Id.* (emphasis added). This makes sense because the "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment *have the same scope* as against the Federal Government."

---

[5] *See generally*, *United States v. Quiroz*, 2022 WL 4352482 (W.D.Tex 2022)(dismissing indictment under 18 USC § 922(n) as inconsistent with this Nation's historical tradition). [19] As the extensive historical analysis of the Reconstruction period in *McDonald* shows, the evidence around Reconstruction is most relevant to determining *whether* a right has been incorporated, 561 U.S. at 777, while the content of that right is the public understanding in 1791.

*Id.* (citing *Ramos v. Louisiana*, 140 S.Ct. 1390, 1397 (2020); *Timbs v. Indiana*, 139 S.Ct. 682, 686–687 (2019); *Malloy v. Hogan*, 378 U.S. 1, 10–11 (1964)). And regardless of any other debate, there is no dispute that 1791 is when the Bill of Rights limited the Federal Government. Thus, in order to ensure uniformity of incorporated rights with respect to the Federal Government and the States, 1791 is the relevant time to "peg[] . . . the public understanding of the right." *Bruen*, 142 S. Ct. at 2137; *see also McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010) (noting the Court's "decisive[]" holding "that incorporated Bill of Rights protections 'are all to be enforced against the States . . .according to the same standards that protect those personal rights against federal encroachment'" (quoting *Malloy*, 378 U.S. at 10)).

In this matter, the Government is unable to establish its burden, as there are no historical analogues around the time of Founding or even through the 1800s or early 1900s.[6] It was not until 1938–or 147 years after ratification of the Second Amendment[7] – with the passage of the Federal Firearm Act that dealers in firearms

---

[6] Although several Circuit Courts of Appeals have reviewed the constitutionality of the FFL licensing scheme at issue here, reaching the conclusion that the regulations were constitutionally permissible, none have done so since the Supreme Court's decision in *Bruen* under the text and history test. *See generally*, *U.S. v. Marzarella*, 614 F.3d 85 (3d. Cir 2010); *U.S. v. Hosford*, 843 F.3d 161 (4th Cir. 2016).

[7] At least four generations would have come and gone, before the Federal Firearms Act was enacted. *See*,https://longevity.technology/news/usa-embrace-longevity-or-grow-old- fast (declaring that "[a]t the time of America's founding in 1776, the average newly- minted American citizen could expect to live to the ripe old age of 35…")

became subject to a licensing requirement. The Gun Control Act of 1968 would later supersede the Federal Firearms Act and, subject to numerous amendments, is currently what still governs FFL licensing today. As discussed *supra*, the *Bruen* and *Heller* Courts assigned virtually no value to laws advanced by the government from the mid- to late-19th-century that were not based on previously established laws. *See Bruen* at 2154; *See Heller* at 614.

Additionally, the current form of section 923 requires that an application for a federal firearms license include a photograph of the applicant. This requirement was not added until 1995 by section 110301 of the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. 103-322 (1994), and there is no historical analog for such a statutory requirement, as citizens have always been able to prove their identity through documentary evidence, and still do to this day. Perhaps more disconcerting is the fact that the purchase of a firearm is the only constitutionally regulated activity to require photo identification.

Here, there is no national historical tradition of the regulation of the commercial sale of firearms present until the 1930s, *i.e., the 20th century*. In the absence of any such national historical tradition, § 923(a) and the violations thereof at § 922(a)(1)(A) and 924(a)(1)(D) are facially unconstitutional as violative of the Second Amendment.

### C. Fifth Amendment Application: The Rule of Lenity

The continuous, shifting, definitional changes by the government itself make clear that the previous definition of a "business" requiring federal licensing for a gun sale, under which Mr. King has been indicted, was impermissibly vague, requiring Mr. King, a man of common intelligence, to guess at its meaning. As such, this Court should dismiss the indictment as violative of the rule of lenity and on the basis that the charged offense is void for vagueness. [13]

The "principle of legality," the "first principle"–otherwise known as the *nulla poena sine lege* of criminal law–requires that criminal laws be explicitly and unambiguously specified in advance by statute. *Liparota v. United States*, 471 U.S. 419, 424 (1985) (declaring that "[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute," citing to *United States v. Hudson*, 7 Cranch 32, 3 L.Ed. 259 (1812)). While "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law" (*Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926)), the rule of lenity – a compliment to the vagueness doctrine – "is a common law doctrine that directs courts to construe ambiguous criminal statutes in favor of criminal defendants. *Alexis v. State*, 437 Md. 457, 484-85 (2014).

In this vein, Justice Frankfurter, writing for the Court, wrote: "[W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States v. Universal C. I. T. Credit Corp.*, 344 U.S. 218, 221–22 (1952). Similarly, the Court has declared that "before a man can be punished as a criminal under the federal law his case must be 'plainly and unmistakably' within the provisions of some statute." *United States v. Gradwell*, 243 U.S. 476, 485 (1917). [11] More recently, the Court has declared that any "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Yates v. United States*, 135 S.Ct. 1074, 1088 (2015) (internal citation omitted).

As held by the U.S. Supreme Court, "the touchstone" of the lenity principle "is statutory ambiguity." *Lewis v. United States*, 445 U.S. 55, 65 (1980). As Professor Sunstein has explained:

> One function of the lenity principle is to ensure against delegations. Criminal law must be a product of a clear judgment on Congress's part. Where no clear judgment has been made, the statute will not apply merely because it is plausibly interpreted, by courts or enforcement authorities, to fit the case at hand. The rule of lenity is inspired by the due process constraint on conviction pursuant to open-ended or vague statutes. While it is not itself a constitutional mandate, it is rooted in a constitutional principle, and serves as a time-honored nondelegation canon.

Cass R. Sunstein, Nondelegation Canons, 67 U. Chi. L. Rev. 315, 332 (2000).

As the statutes fail to present a clear definition of what constitutes "engaging in the business" and have since been amended in an attempt to clarify the definition, as well as ATF having clearly maintained since at least 2016 that there "is no bright-line rule for when a federal firearms license is required," neither Mr. King, nor any other person of common intelligence, could know what conduct was prohibited by sections 922(a)(1)(A) and 924(a)(1)(D).

The District Court here failed to recognize these Constitutional considerations, as raised by Appellant in both his motion to dismiss, Appx53, and his motion to set aside the verdict, Appx186.

### D. First Amendment Application

Separately, 18 U.S.C. § 923(a) and the violations thereof at §§ 922(a)(1)(A) and 924(a)(1)(D) are unconstitutional as applied to Mr. King and other members of the Amish faith. As mentioned *supra*, section 923 requires applications for a federal firearms license to submit a photograph with their application. Applicants who do not include a photograph are not eligible for and will not be issued an FFL. As discussed in greater detail *infra*, prohibiting Mr. King and other members of the Amish faith from the ability to engage in the commercial sale of firearms, as a result of the exercise of their bonafide closely-held religious beliefs,[24,] *i.e.,* refusing to pose

for photograph, is an unconstitutional condition which violates their First and Second Amendment rights as well as the Religious Freedom Restoration Act of 1993.

The seminal case governing the Amish faith and the limits of governmental imposition upon them concerning their faith recognizes the fundamental right to the freedom of religion outweighs the state's interest in areas more compelling than licensing a gun sale from a farmer to his neighbor. *Wisconsin v. Yoder*, 406 U.S. 205 (1972). At any rate, requiring a photo identification to secure a simple sale of a gun by a farmer to a neighbor is not narrowly tailored to any compelling governmental interest when this government acknowledges it would be Constitutionally offensive to even require a photo identification to vote. As such, the conviction violates the First Amendment as applied to King.

## II. The Forfeiture of Mr. King's Collection of Personal Firearms Violated the Constitution As Applies to Mr. King

The government forfeited all interest in Mr. King's lifetime gun collection of 609 personally owned firearms for offering to sell a few guns to a neighbor without a federal firearms license. This forfeiture exceeded the government's Constitutional authority under the First, Second, Fifth, and Eighth Amendments. Principally and primarily, the forfeiture exceeded the Second Amendment for the same reasons the crime charged itself exceeded the Second Amendment, offending the First and Fifth

Amendments in the process. Secondarily but significantly, it constitutes an Excessive Fine under the Eighth Amendment.

## A. Constitutional Constraint on Criminal Forfeiture

The Supreme Court has continuously challenged the constitutionality of the forfeiture practices, especially where fundamental rights are concerned. In *Timbs v. Indiana*, which dealt with the forfeiture of a vehicle, Justice Thomas, in his concurring opinion, emphasized the constitutional concerns and issues of the current civil forfeiture standards and practices. 139 S. Ct. 682 (2019). While Justice Thomas agreed with the Supreme Court's ruling that the Fourteenth Amendment makes the Eighth Amendment's prohibition on excessive fines fully applicable to the states, noting the "right to be free from excessive fines is one of the 'privileges or immunities of citizens of the United States" protected by the Fourteenth Amendment." *Id.* He addressed the question of whether the Eighth Amendment's prohibition on excessive fines was an "inalienable right[] of all men, given legal effect by [its] codification in the Constitution's text." *McDonald v. Chicago,* 561 U.S. 742, 818 (2020). Justice Thomas concluded that "[t]he historical record overwhelmingly demonstrates that it was." *Timbs* at 693, 698. To secure a criminal penalty like a fine, disgorgement of illegal profits, or restitution, the government must comply with strict procedural rules and prove the defendant's guilt beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 363, 90 S.Ct. 1068, 25 L.Ed.2d 368

(1970); *Culley v. Marshall*, 601 U.S. 377, 144 S. Ct. 1142, 1154 (2024) (Gorsuch, J., concurring).

## B. This Order of Forfeiture Constitutes an Excessive Fine

The Eighth Amendment provides that: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "The Excessive Fines Clause traces its roots as far back as the Magna Carta." *United States v. Cheeseman*, 600 F.3d 270, 282 (3d Cir. 2010); *see United States v. Premises Known as RR No. 1 Box 224, Dalton, Scott Twp. & North Abington Twp., Lackawanna, Pa.,* 14 F.3d 864, 875 n. 12 (3d Cir.1994) ("Blackstone says that the reasonableness of a fine must be determined by reference to Magna Carta's prohibition on excessive amercements [a common criminal sanction]. Specifically, Blackstone says 'no man shall have a larger amercement imposed upon him, than his circumstances or personal estate will bear: saving to ... the trader his merchandize.' ") (citing 4 William Blackstone, *Commentaries* *372). Thus, at the time of the Framing, the Founders understood " 'fine' ... to mean a payment to a sovereign as punishment for some offense." *Bajakajian,* 524 U.S. at 327, 118 S.Ct. 2028 (internal quotation marks & citation omitted); *see also Austin v. United States,* 509 U.S. 602, 609, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) ("The purpose of the Eighth Amendment ... was to limit the government's power to punish."). In turn, the Excessive Fines Clause restricts "the Government's power to

extract payments, whether in cash or in kind, as punishment for some offense." *Bajakajian,* 524 U.S. at 328, 118 S.Ct. 2028 (internal quotation marks & citation omitted). The Eighth Amendment is applicable if the forfeiture constitutes a "fine" and is violated only if that fine is "excessive." *See Tillman,* 221 F.3d at 420. Based on more recent precedent and clarification by the Supreme Court, a modern statutory forfeiture is a 'fine' for Eighth Amendment purposes if it constitutes punishment even in part, regardless of whether the proceeding is styled *in rem* or *in personam.*" 524 U.S. at 331, 118 S.Ct. 2028.at 331 n. 6, 118 S.Ct. 2028. Forfeiture pursuant to the statutes under which this case relies is nonetheless subject to Eighth Amendment scrutiny. Here, the forced forfeiture of Mr. King's firearms is criminal in nature since it is part of his criminal judgment and sentence.

Mr. King was subject to the forfeiture pursuant to the following:

28 U.S. Code § 2461(c):

If a person is charged in a criminal case with a violation of an Act of Congress For which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case pursuant to [1] the Federal Rules of Criminal Procedure and section 3554 of title 18, United States Code. The procedures in section 413 of the Controlled Substances Act (21 U.S.C. 853) apply to all stages of a criminal forfeiture proceeding, except that subsection (d) of such section applies only in cases in which the defendant is convicted of a violation of such Act.

18 U.S.C. §924(d)(1):

Any firearm or ammunition involved in or used in any knowing violation of subsection (a)(4), (a)(6), (f), (g), (h), (i), (j), or (k) of section 922, or knowing importation or bringing into the United States or any possession thereof any firearm or ammunition in violation of section 922(l), or knowing violation of section 924, 932, or 933, or willful violation of any other provision of this chapter or any rule or regulation promulgated thereunder, or any violation of any other criminal law of the United States, or any firearm or ammunition intended to be used in any offense referred to in paragraph (3) of this subsection, where such intent is demonstrated by clear and convincing evidence, shall be subject to seizure and forfeiture, and all provisions of the Internal Revenue Code of 1986 relating to the seizure, forfeiture, and disposition of firearms, as defined in section 5845(a) of that Code, shall, so far as applicable, extend to seizures and forfeitures under the provisions of this chapter: Provided, That upon acquittal of the owner or possessor, or dismissal of the charges against him other than upon motion of the Government prior to trial, or lapse of or court termination of the restraining order to which he is subject, the seized or relinquished firearms orammunition shall be returned forthwith to the owner or possessor or to a person delegated by the owner or possessor unless the return of the firearms or ammunition would place the owner or possessor or his delegate in violation of law. Any action or proceeding for the forfeiture of firearms or ammunition shall be commenced within one hundred and twenty days of such seizure.

The "touchstone of the constitutional inquiry ... is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Bajakajian* at 334, 118 S.Ct. 2028.

In this case, the government criminally forfeited an entire lifetime of gun collection for the mere act of an Amish farmer offering to sell a few guns to a neighbor, a classic example of disproportionate punishment, and as such, Constitutionally excessive in contravention of the Eighth Amendment.

## **CONCLUSION**

For the reasons set forth above, Appellant King respectfully requests this Court recognize the legal errors the district court made below and further vacate the verdict, dismiss the indictment, and reverse the forfeiture

Pursuant to F.R.A.P 34(a), oral argument is hereby requested.

Dated June 19, 2024                    Respectfully submitted,

                                       /s/ Robert E. Barnes
                                       Robert E. Barnes, Esq.
                                       CA. Bar ID #: 235919
                                       Barnes Law, LLP
                                       700 S. Flower Street, Suite 1000
                                       Los Angeles, CA 90017
                                       Telephone: (310) 510-6211
                                       Fax: (310) 510-6225
                                       Email: robertbarnes@barneslawllp.co

                                       *Counsel for Appellant Reuben King*

## <u>CERTIFICATION</u>

I, the undersigned, hereby certify the following:

1. I am a member of the Bar of the United States Court of Appeals for the Third Circuit.

2.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 8,779 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

3.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type requirements of Fed. R. App. P. Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman. The text of the electronic and paper versions of the foregoing brief are identical.

4.    A virus check was performed on this brief, and none was indicated.

5.    On June 19, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered users.

Dated June 19, 2024                    Respectfully submitted,

                                     */s/ Robert E. Barnes*
                                     Robert E. Barnes, Esq.
                                     CA. Bar ID #: 235919

Barnes Law, LLP
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone: (310) 510-6211
Fax: (310) 510-6225
Email: robertbarnes@barneslawllp.co

*Attorney for Appellant Reuben King*